IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| INTERSTATE BAKERIES | ) | Bk. Case No. 04-45814-11-JWV |
| CORPORATION, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| LEWIS BROTHERS BAKERIES | ) | |
| INCORPORATED AND CHICAGO | ) | |
| BAKING COMPANY, | ) | |
| | ) | |
| Appellants, | ) | Case No. 10-00611-CV-W-DGK |
| | ) | |
| v. | ) | |
| | ) | |
| INTERSTATE BRANDS CORPORATION, | ) | |
| | ) | |
| Appellee. | ) | |

**ORDER DENYING APPEAL FROM BANKRUPTCY COURT**

Pending before the Court is Appellants Lewis Brothers Bakeries Inc.'s ("LBB") and Chicago Baking Company's ("CBC") Notice of Appeal (doc. 1) brought pursuant to 28 U.S.C. § 158(a)(1). LBB/CBC appeal the bankruptcy court's[1] determination that the License Agreement between LBB/CBC and Appellee Interstate Brands Corporation ("IBC") is an executory contract under § 365 of the Bankruptcy Code, thus IBC is entitled to summary judgment.

The Court holds that failure to maintain the character and quality of goods sold under the Trademarks would constitute a material breach of the License Agreement, thus a material obligation remains under the License Agreement, and it is an executory contract. Additionally, the doctrine of promissory estoppel does not bar IBC from arguing that the License Agreement is an executory contract. The judgment of the bankruptcy court is AFFIRMED.

---

[1] The Honorable Jerry W. Venters, United States Bankruptcy Judge for the Western District of Missouri.

## Standard of Appellate Review

This Court reviews the bankruptcy court's conclusions of law related to the grant of summary judgment *de novo*, and the bankruptcy court's findings of fact in the summary judgment ruling for clear error. Fed. R. Bankr. P. 8013; *In re SRC Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008).

## Background

The following facts are drawn from the bankruptcy court's memorandum opinion and are undisputed by the parties.

On January 9, 1996, the United States District Court for the Northern District of Illinois entered final judgment in an antitrust action brought against Interstate Bakeries Corporation by the federal government. The judgment required Appellee IBC divest itself of certain rights and assets in order to create viable competition for the sale of "White Pan Bread" in the Chicago area. The judgment obligated IBC to execute a "perpetual, royalty-free, assignable, transferable, exclusive" license to certain bread labels in the Chicago area and central Illinois. On December 27, 1996, IBC granted such a license to Appellants LBB/CBC in conjunction with a $20 million asset purchase agreement. Of the purchase price, $11.88 million was allocated for tangibles, and the remainder was for intangibles such as the license. $17 million was paid at the closing and the remaining $3 million was paid in a note that was paid in full in 2002.

The License Agreement contains the following relevant provisions:

> a. In the first "WHEREAS" clause: "IBC is the owner of or has the right to use and sublicense to Licensee (LBB/CBC) the trademarks, labels and logos and registrations thereof set forth in Schedule A hereto."
>
> b. In the second WHEREAS clause: "[I]n order to comply with the Final Judgment . . . IBC has agreed to extend a license to

Licensee and Licensee desires to make use of the Trademarks subject to the terms and conditions set forth herein."

c. Section 1.1(a): "IBC expressly reserves from such license all rights and uses of the Chicago Trademarks outside the Chicago Territory. . . . IBC also expressly reserves from such license all rights and uses of the Chicago Trademarks in the Chicago Territory on products other than fresh and returned bread, buns, bread rolls and other bakery products."

d. Section 1.4: "Licensee shall have no right to sublicense the Trademarks or the use of the Trademarks to any third party."

e. Section 2.1: "Licensee acknowledges and agrees that IBC is the exclusive owner of or has the right to use, the Trademarks and all goodwill associated therewith and that IBC shall retain the full ownership interest in and to the Trademarks; the associated goodwill and all registrations granted thereon; and that all use of the Trademarks by Licensee shall inure to the benefit of and be available to IBC. Except for the rights specifically granted or licensed herein, Licensee shall have no rights to the Trademarks."

f. Section 2.2: "Licensee shall not anywhere register, or cause to be registered, any corporate logo, name or trademark consisting of, comprising or containing the Trademarks, including without limitation any registration in the United States Patent and Trademark Office."

g. Section 2.3: "Licensee shall not contest the title of IBC to the Trademarks or registrations thereof or challenge the validity of this Agreement and Licensee shall not take any action or fail to take any action the result of which could reasonably foreseeably adversely prejudice IBC's interest in the Trademarks."

h. Section 3.1: "Licensee shall use the Chicago Trademarks owned by IBC only in the form and manner and with appropriate legends as prescribed from time to time by IBC."

i. Section 3.2: "Licensee shall not use any of the Trademarks owned or licensed by IBC as its corporate name or title in whole or in part and shall not, without the prior written consent of IBC, alter or combine such owned or sublicensed Trademarks with other terms, or use such Trademarks in connection with any business other than as licensed hereunder."

j. Section 5.2: "IBC shall have the right to terminate this Agreement in the event of the material breach of any of the terms hereof by Licensee. . . . A material breach shall include but not be limited to a failure of LBB to maintain the character and quality of goods sold under the Trademarks as provided for in Section 6.1 hereof."

k. Section 5.3: "Upon the termination of this Agreement pursuant to Sections 1.2 or 5.2, Licensee shall cease and terminate all use of any kind whatsoever of the Trademarks. Licensee shall not replace the Trademarks with any other words, logos or phrases confusingly similar thereto."

l. Section 6.1: "Goods sold or otherwise distributed by Licensee under the Trademark shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks. . . . Licensee shall use raw materials, ingredients and packaging supplies of a quality at least as high and consistent with the quality previously used by IBC in connection with the same or similar products."

m. Section 7.1: "Claims Against Third Parties. Licensee and IBC shall each notify the other of any actual, alleged or threatened infringement of rights under the Trademarks in the Territory by any third party promptly as it comes to the attention of Licensee or IBC, as the case may be. IBC shall have the sole discretion at its own cost and expense, to bring proceedings involving the Trademarks in its own name and to join Licensee as a party against any third party infringing either directly or contributorily. If IBC should determine to bring such suit, all recovery shall be retained by IBC. Licensee shall reasonably assist IBC as requested and cooperate in any such litigation at IBC's expense; provided, however, IBC shall have full control over the conduct of the suit, including the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder.

n. Section 7.2: "Claims by Third Parties. Licensee and IBC shall promptly notify each other of all information as it comes into their possession relative to any actual or threatened infringement suit by third parties in relation to Licensee's use of the Trademarks. IBC shall have the sole right, but not the obligation, to control at its own cost and expense the defense of such suit, including but not limited to the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder."

o. Section 8.1: "No Warranty For Claims by Third Parties. IBC has the right to use and license others to use the Trademarks it owns in the manner contemplated by this Agreement; however, IBC specifically disclaims any warranty that Licensee will be free from claims of third parties with respect to the Trademarks. Licensee acknowledges that it has no right to indemnification from IBC as a result of any third party challenges to Licensee's use of the Trademarks hereunder. Subject to the preceding sentence, IBC shall defend, indemnify and hold Licensee harmless against any and all claims, demands, causes of action, judgments, cost and expenses, including reasonable attorney's fees, arising out of any willful act or omission by IBC with respect to any of its obligations under this Agreement."

p. Section 8.2: "Indemnification of IBC by Licensee. Licensee shall defend, indemnify and hold IBC harmless against any and all claims, demands, causes of action, judgments, cost and expenses, including reasonable attorney's fees arising out of Licensee's manufacture, distribution, shipment, advertising, promotion, offering for sale or sale of the goods sold under the Trademarks, or any defects in such goods other than those supplied by IBC to Licensee, as well as related advertising and promotional materials, provided Licensee receives prompt notice of such claim, demand, cause of action or judgment and is permitted to deal with it in Licensee's sole discretion."

q. Section 9.1: "This Agreement, together with the Exhibits and Schedules hereto and the agreements referenced herein, constitute the entire agreement between the parties respecting the subject matter hereof and supersedes all prior written or oral agreements or understandings in variation of its terms."

r. Section 9.2: "Except as expressly set forth herein, this Agreement shall not be modified, altered or amended except by Agreement in writing signed by duly authorized representatives of the parties hereto."

s. Section 9.3: "This Agreement shall be governed by the statutory and decisional law of the State of Illinois. . . ."

t. Section 9.5: "Except as otherwise specifically provided herein, no failure or delay on the part of any party hereto to enforce any provision of this Agreement or to exercise any right granted hereby shall operate as a waiver thereof unless or until the right to enforce

5

any such provision or to exercise any such right has been waived in writing by such party."

After the license was purchased, the parties exchanged correspondence several times regarding certain packaging and possible trademark violations.

On September 22, 2004, Interstate Bakeries Corporation and eight subsidiaries, including Appellee IBC, filed the underlying Chapter 11 bankruptcy. On December 1, 2008, Appellants LBB/CBC filed an adversary proceeding within the bankruptcy case for a declaratory judgment that the bread label license agreement is not an executory contract. After cross-motions for summary judgment, the bankruptcy court entered judgment for IBC, finding that the license was an executory contract. The bankruptcy court subsequently denied LBB/CBC motion to reconsider, and LBB/CBC appealed to this Court.

## Discussion

The parties agree that the primary issue in this case is whether the license at issue is an executory contract within the meaning of § 365 of the bankruptcy code. LBB/CBC argue it is not an executory contract because they have substantially performed and no material obligations remain, and they rely heavily on *In re Exide Technologies, Inc.* for support. They also contend that IBC is estopped from claiming the License Agreement is executory.[2]

In response, IBC argues that the bankruptcy court's ruling is consistent with Eighth Circuit law; that trademark licenses are by their nature executory contracts; that both parties have material obligations remaining under the contract; that the *Exide* decision does not alter the analysis in this case; and that LBB/CBC cannot establish the key elements of estoppel.

---

[2] In their initial brief LBB/CBC raised a third argument that, "The parties plainly intended to sell the trademarks, and the License truly was a sale of the trademarks in the relevant territories." In its response IBC noted that LBB/CBC waived any such argument they may have had on appeal because they did not address how the bankruptcy court disposed of this argument below. IBC also argued that the bankruptcy court properly ruled that the parol evidence rule bars LBB/CBC from arguing that the License Agreement is anything but a sale of a license, not the trademarks. These arguments are well made, and LBB/CBC fail to address them in their reply. The Court holds LBB/CBC have conceded this argument.

6

Section 365 of the Bankruptcy Code provides that a debtor-in-possession "may assume or reject any executory contract, but the Code does not define what an "executory contract" is. 11 U.S.C. § 365. Professor Vern Countryman defined an executory contract as,

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973). This definition, known as the "Countryman Standard," has subsequently been adopted by a majority of the federal circuit courts, including the Eighth Circuit.[3]

In applying this standard courts in the Eighth Circuit look at whether any material obligations remain unperformed. *Cameron v. Pfaff Plumbing and Heating, Inc.*, 966 F.2d 414, 416 (8th Cir. 1992). Minor obligations, or a duty to ensure that some subsequent condition not occur, are not material obligations. *In re Exide*, 607 F.3d at 964. In determining whether any material obligations remain, a federal court looks to the applicable state law for the definition of material. Illinois law governs the License and Asset Purchase Agreement, and under Illinois law a material obligation is an important or substantial obligation. *See Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. P'ship*, 619 N.E.2d 144, 154 (Ill. App. Ct. 1993).

**I.      The License Agreement is an executory contract.**

While trademark license agreements are usually held to be executory contracts, they are not universally considered executory. *In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1495 (9th Cir. 1991). The question is whether, at the time the debtor filed its petition for bankruptcy, the license agreement contained at least one obligation for both parties that would constitute a

---

[3] *See In re Knutson,* 563 F.2d 916, 917 (8th Cir. 1977) (quoting Countryman's article); *In re Baird*, 567 F.3d 1207, 1211 (10th Cir. 2009); *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008); *In re Sunterra Corp.*, 361 F.3d 257, 264 (4th Cir. 2004); *In re CFLC, Inc.*, 89 F.3d 673, 677 (9th Cir. 1996); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989).

7

material breach if not performed. *In re Exide*, 607 F.3d at 962. The Court finds that as of September 22, 2004, at least one explicitly material obligation remained outstanding, namely LBB/CBC's promise to maintain the character and quality of goods sold under the trademarks, therefore the license agreement is an executory contract.

While *Exide* is factually similar to this case, it is not analogous. In *Exide* the debtor, Exide Technologies, Inc. ("Exide") sold its industrial battery division to EnerSys Delaware, Inc. ("EnerSys") in 1991. *Exide*, 607 F.3d at 960. The parties entered into several agreements in connection with the transaction, including a license agreement and an asset purchase agreement. *Id.* at 960-61. As part of the license agreement Exide granted a perpetual, exclusive, royalty-free license to use its trademark. *Id.* at 961. At closing, EnerSys paid Exide more than $135 million for the assets and license. *Id.* at 960. This arrangement served the parties well for almost ten years. *Id.* at 961. But in 2002 Exide filed for Chapter 11 bankruptcy and sought to reject the license agreement as an executory contract. *Id.* EnerSys objected, arguing that the license agreement was not executory. *Id.*

Exide argued that the license agreement was executory because EnerSys had a number of ongoing, substantial obligations, including (1) an obligation to satisfy a quality standards provision; (2) an obligation to observe a use restriction on the trademark; and (3) an obligation to observe an indemnity provision. *Id.* at 963.[4] The Third Circuit Court of Appeals rejected these arguments, holding these obligations were either a condition subsequent, which is not a material obligation, or too minor to affect substantial performance under the agreement. *Id.* at 964.

Similarly, in this case the parties entered into a $20 million asset purchase agreement wherein IBC sold LBB/CBC a variety of assets, including a "perpetual, royalty-free, assignable, transferable, exclusive" license to certain bread labels in the Chicago area. LBB/CBC paid $17

---

[4] Exide did not claim that it owed any substantial obligations to EnerSys. *Exide*, 607 F.3d at 963 n.4.

8

million at closing in 1996, with the remaining $3 million paid by 2002. After IBC entered bankruptcy in 2004 and moved to reject the License Agreement, Appellants objected, arguing that under *Exide* the License Agreement is not an executory contract. IBC argues both parties have material obligations remaining under the contract.[5]

But there is a crucial factual distinction in this case: Section 5.2 of the License Agreement states that "a failure of [LBB/CBC] to maintain the character and quality of the goods sold under the Trademarks as provided for in Section 6.1 hereof" shall constitute a "material breach," entitling IBC to terminate the License Agreement. Because the License Agreement provides that a failure to maintain the character and quality of the goods would constitute a "material breach," the Court need not engage in any materiality analysis, as the *Exide* court did, to determine if any of the parties' ongoing obligations are material. The parties agreed and acknowledged this obligation was material in 1996 when they entered the License Agreement.

Appellants argue that maintaining quality is not a material obligation because the Quality Control provision[6] states no specific standard of quality to measure their performance, and the

---

[5] Specifically IBC contends it has continuing obligations to: 1) maintain and defend the Trademarks; 2) control the quality of the goods produced with the Trademarks; 3) notify LBB/CBC of any actual, alleged or threatened infringement of the Trademarks; 4) at IBC's discretion, maintain "full control" over any infringement actions; 5) refrain from settling any infringement action in a manner that materially prejudices LBB/CBC's rights under the License Agreement; 6) refrain from suing LBB/CBC for trademark infringement; 7) refrain from using the Trademarks in the Chicago Territory; and 8) indemnify LBB/CBC against all claims arising out of any willful act or omission with respect to its obligations under this Agreement. It claims LBB/CBC has unperformed, material obligations to: 1) refrain from sublicensing the Trademarks; 2) limit the use of the Trademarks to the specified territory, and products; 3) refrain from registering the Trademarks, or contesting IBC's title to the Trademarks; 4) execute documents to preserve and extend the Trademarks; 5) use the Trademarks only as prescribed by IBC; 6) to use the Trademarks only as licensed; 7) maintain the character and quality of all goods sold under the Trademarks; 8) notify IBC of any actual, alleged or threatened infringement of the Trademarks; and 9) assist IBC in any infringement litigation and indemnify IBC for any lawsuits arising out of LBB/CBC's use of the Trademarks.

[6] The Quality Control provision is contained in Section 6.1. It states:

> **Standards**. Goods sold or otherwise distributed by Licensee under Trademarks shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks and such present character and quality shall be considered an acceptable standard of quality. Licensee shall use raw materials, ingredients and packaging supplies of a quality at least as high and

9

termination provision provides that IBC must give LBB/CBC notice and thirty days to cure any breach. They contend that since IBC has never even tried to monitor their bread quality, and if there were a problem they would certainly fix it within thirty days, it is not a material obligation. But the question is not whether LBB/CBC are likely to breach this provision, the question is if they breached this provision, would the breach be material? And the answer is yes, because in the event of a breach IBC could terminate the License Agreement. Consequently, the License Agreement is an executory contract.

## II.    Appellants cannot establish the key elements of promissory estoppel.

Appellants also argue that "IBC should be barred by promissory estoppel from contending that the License Agreement should be treated as an executory contract rather than as part of IBC's sale of its business operations and trademarks in the Chicago and Central Illinois territories." IBC claims LBB/CBC cannot establish the first element of its promissory estoppel claim, that IBC made an unambiguous promise to *sell* the trademarks to appellants.

To establish promissory estoppel a party must prove that (i) the defendant made an unambiguous promise, (ii) plaintiff relied on the promise, (iii) reliance was expected and foreseeable, and (iv) plaintiff relied to its detriment. Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 906 N.E.2d 520, 523-24 (Ill. 2009). In the context of the present case LBB/CBC must show (i) IBC made an unambiguous promise to LBB/CBC that is was selling the Trademarks to them under the License Agreement; (ii) LBB/CBC relied on this unambiguous promise; (iii) it was expected and foreseeable that LBB/CBC would rely on IBC's unambiguous promise; and (iv) this reliance was to LBB/CBC's detriment.

---

consistent with the quality previously used by IBC in connection with the same or similar products.

With respect to the first element the License Agreement clearly states,

> Licensee acknowledges and agrees that IBC is the exclusive owner of or has the right to use, the Trademarks and all goodwill associated therewith and that IBC shall retain the full ownership interest in and to the Trademarks; the associated goodwill and all registrations granted thereon; and that all use of the Trademarks by Licensee shall inure to the benefit of and be available to IBC. Except for the rights specifically granted or licensed herein, Licensee shall have no rights to the Trademarks.

License Agreement § 2.1. Additionally the parole evidence rule precludes LBB/CBC from using extrinsic evidence to argue that IBC promised to sell the Trademarks. Consequently LBB/CBC cannot establish the first element, and this claim fails.

## Conclusion

Finding that the License Agreement provides that a failure to maintain the character and quality of goods sold under the trademarks is a material breach of the agreement, the Court holds the License Agreement is an executory contract. The decision of the bankruptcy court is AFFIRMED.

**IT IS SO ORDERED.**

Date:  March 21, 2011                               /s/ Greg Kays
                                                             GREG KAYS, JUDGE
                                                             UNITED STATES DISTRICT COURT